Filed 9/8/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>KENNETH MARK DOOLITTLE,<br><br>    Defendant and Appellant. | H037391<br>(Santa Cruz County<br>Super. Ct. No. F17146) |


Defendant Kenneth Mark Doolittle was sentenced to 13 years in prison after the trial court, sitting without a jury, found him guilty on three counts of theft by false pretenses (Pen. Code, § 532, subd. (a)), six counts of theft from an elder or dependent adult (Pen. Code, § 368, subd. (d)), nine counts of false statements or omissions in the sale of securities (Corp. Code, §§ 25401, 25540, subd. (b)), one count of selling unregistered securities (Corp. Code, §§ 25110, 25540, subd. (a)), and one count of sale of a security by willful and fraudulent use of a device, scheme, or artifice to defraud (Corp. Code, § 25541). He challenges the judgment on the grounds that 10 of the charges were barred by the statute of limitations, that two were not supported by substantial evidence, that when modified to accommodate these deficiencies the findings cannot sustain a sentence enhancement based upon the taking or loss of more than $500,000, and that the sentence on two of the charges violated the statutory proscription against multiple punishment (Pen. Code, § 654). We conclude that (1) defendant may challenge the judgment on the grounds that the trial court's implied finding of timely prosecution is not

supported by substantial evidence; (2) his challenge on that ground is well taken with respect to two of the charges; (3) the remedy in such cases is to remand for a further hearing on the timeliness of the affected charges; (4) further hearing may also be necessary to resolve several issues affecting applicability of the sentence enhancement for aggregate losses over $500,000; and (5) on the facts of this case, defendant's conviction for sale of unregistered securities and sale of securities by means of a fraudulent device does not rest on the same conduct as the counts in which he was charged, and on which he was convicted, of fraud against specific victims, and his sentence on the former counts therefore does not offend the proscription against duplicative punishment.

## BACKGROUND

### A. *The Mobile Home Venture*

Defendant was the proprietor of Monterey Bay Securities, a registered securities broker/dealer, and Monterey Bay Investment Corporation, a registered investment advisor. He or his corporations held licenses, permits, or certificates to engage in various additional activities including real estate and insurance brokerage and tax preparation. He testified that while he initially conducted a "general securities business," the "emphasis" later "changed more into real estate," specifically "[r]eal estate financing" and associated ventures. Around 1990 his primary business became "trust deeds investments," in which "you [would] have borrowers that would want to borrow funds secured by real property but, for whatever reason, couldn't get a bank loan and would go to a private source." He "would arrange groups of investors together to buy those loans or to fund those transactions for different types of individuals and institutional borrowers."

Defendant testified that the venture at issue here had its germ in discussions with Larry Kroeker, a "friend who was a mobile home contractor." Kroeker suggested "that

2

we consider going into business to purchase and finance mobile homes because of what he saw in the marketplace at that time." This led to defendant's "selling mobile home notes to investors." He testified that this may have commenced as early as 1997, but bank records show October 1998 as the month when he began making deposits in a bank account designated Mobile Home Trust Account. Deposits continued until September 2005—the year in which, defendant testified, he ceased doing business. The records, which were apparently incomplete, showed total deposits of $14,889,506.68. Apparently, however, this sum included both income from the venture and investments in it.

### B. Montgomery Investment

Of the 10 victims named in this matter, Jacquelyn Montgomery was the earliest to place funds in the mobile home venture. She testified that her history with defendant dated to 1992, when she and her father invested funds with him. After that investment paid off, defendant approached them about an investment in mobile homes. He said their rate of return would be 15 percent. As he described the venture to them, "He would buy mobile homes. And, when the people paid him, we would get our payment with princip[al] with the interest." He said that while there was "always risk," there was "very little in this mobile home investment." He said it was "pretty secure." He told her that if the buyer stopped paying, she "would still receive the interest."[1]

On November 12, 1998, Montgomery wrote a check investing $25,000 in the mobile home venture.[2] These funds apparently went into a trailer whose first purchaser

---

[1] Defendant contradicted this testimony on virtually every point, but the trial court resolved credibility issues against him.

[2] Montgomery may have made later investments, but it is difficult to tell from this record because much of the pertinent testimony fails to adequately distinguish between new payments by her to defendant, and defendant's reinvestment of funds already in his possession. The distinction is obviously relevant, since one element of theft by false pretenses is the victim's transfer of property to the defendant. (See *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842; *People v. Williams* (2013) 57 Cal.4th 776, 787.) It is

3

promptly defaulted on the associated loan. The trailer then went through the hands of several successive purchasers, with monthly payments sometimes stopping and restarting, until one of the purchasers paid off the entire loan. When that happened, apparently in February 2002, the proceeds were reinvested in another trailer without Montgomery's knowledge or consent. At the time of trial Montgomery had received all but six of the payments due on that trailer.

### C. Perdue Investments

Another early investor was Joseph Perdue, who was "80-something" at the time of trial and who had died by the time of sentencing.[3] He was the victim named in counts 8 and 18 of the information, which respectively charged defendant with theft from an elder (Pen. Code, § 368, subd. (d)) and false statements and omissions in connection with an offer of a security (Corp. Code, §§ 25401, 25540, subd. (b)).

Mr. Perdue invested $50,000 in October 1999 and another $50,000 in February 2000. Each of these investments was confirmed in letters from defendant. In the first letter, dated October 4, 1999, defendant acknowledged that Perdue had invested "$50,000.00 into mobile home notes through our office." He wrote that the term of the notes was seven years and that investors generally held them to maturity, adding, "However, our office has made a practice of maintaining a secondary market for these notes in case an investor needs to liquidate their note for cash prior to it's [*sic*] maturity. Please accept this letter as a firm commitment from me personally to sell your note to another client (without loss) should the need arise."

doubtful that the reinvestment of funds already in the defendant's possession can satisfy this element, even if the victim's acquiescence in such reinvestment is procured by fraud. The question has not been briefed, however, and we express no final opinion on it.

[3] Sentencing took place some two years after the court rendered its verdict. In comments to victims and relatives who appeared at sentencing, the court attributed this delay in part to trial counsel's having fallen ill.

4

The second letter, dated February 18, 2000, stated that Perdue had "agreed to lend us $50,000.00 to be used for the purchase and sale of mobilehomes," that "we" would "place[] [the funds] in our trust account" and "spend" them "to acquire, repair (if necessary), and resell bank repossessed and distress sale mobilehomes throughout the United States." The firm would "hold financing contracts on the mobilehomes and w[ould] create promissory notes that [it] w[ould] hold in [its] name." It assumed responsibility for collecting monthly payments, and undertook to pay monthly interest to Perdue at a 15 percent annual rate.[4] The letter specified that "[t]he $50,000.00 balance that we have borrowed from you will result in you receiving $625.00 as monthly interest payments." The concluding paragraph stated, "Should you decide to withdraw your funds from your loan to us, we will refund to you the full or partial requested amount to you upon no less than sixty days notice."

The third letter, dated February 21, 2000, reconfirmed Perdue's second investment and contained identical recitals except for the concluding paragraph, which stated, "You have asked that we agree to a two year term for this loan. This will mean that this loan will mature on 2/21/2002. Should you decide not to withdraw your funds from your loan to us at that time, we can renegotiate the terms for a possible extension at that [*sic*]. Should you have any further questions, please do not hesitate to call."

Beginning in March or April of 2000, Perdue received four successive monthly payments totaling about $5,000. After that he apparently received nothing more from his investment.

---

[4] Defendant testified that the promise of 15 percent interest applied only "prior to assignment," i.e., pending the invested funds' use to purchase a mobile home. A letter to at least one other investor contained language at least arguably consistent with such an intention. However the letters to Perdue did not.

### D. Repetti Investments

Mary Repetti was 68 years old when she commenced a series of investments in the mobile home venture. She had been investing with defendant for years, having met him around 1988 or 1989. When defendant first told her and her husband about the mobile home venture, Mr. Repetti, "being an old real estate broker, was very skeptical and . . . really didn't want to go along with the program." But defendant was "a good salesman" and "convinced us that they were a safe investment." He said "he would be collecting the payments, distributing them to us," as well as "taking care of any foreclosure matters," a subject they discussed "in detail." He "kept mentioning 15 percent." He "guarantee[d]" this rate of return. He said their investment would be secured "[b]y notes." He informed them in writing that if a purchaser stopped paying on the note, he would "take care of all expenses." "[T]here would be no servicing charges on our part."

The Repettis initially invested $100,000. Defendant memorialized the investment in a letter dated November 9, 1999. It included the statement, "We agree to guarantee to you the timely repayment of principal and interest on each note that you hold throughout the duration of each note." It also said, "The interest rate you will receive will be 15% on the remaining principal balance."

The Repettis received an "Investor Portfolio" dated February 10, 2000, listing five loans in which their funds had apparently been placed. Mrs. Repetti received payments on some notes, while payments stopped on others. However, she apparently made at least six further investments in the mobile home scheme, the last of which was either in 2002 or 2005. She testified that her total investment was $250,000.

### E. Lipsius Investment

Jeffrey Lipsius testified that he was looking for an investment counselor and an accountant to do his taxes in 1999 or 2000 when he found defendant's name in the phone book under investment counselors. He initially engaged defendant only to do his taxes,

6

but defendant began giving him investment advice as well. Lipsius told defendant he was looking for a safe investment for his daughter, who would be going to college in a few years. Defendant said he knew about a "mobile home investment" that paid 15 percent, was "great," and was "very safe" and "risk-free." The only detail Lipsius recalled about the nature of the venture was that "it involve[d] mobile homes. Somehow the money [wa]s invested in mobile homes."

Defendant did not explain "how it would be handled if the purchaser of a mobile home stopped payment." He did not "explain that, if certain conditions occurred, [Lipsius] would not get paid." He did not tell Lipsius that payments would only be made to him if the mobile home purchaser paid defendant. Nor did he say that Lipsius would not be paid if the mobile home market took a downturn. He did not say that he could use the invested money for his personal needs. Had he said any of these things, Lipsius would not have invested.

On August 1, 2000, after the idea "percolated . . . for a number of months," Lipsius gave defendant a check for $25,000 to invest in the described enterprise. Thereafter he "request[ed] paperwork" from defendant. When this was not immediately forthcoming, Lipsius had "second thoughts about the investment," and in an October 2000 meeting with defendant, he "asked him for [his] money back." Defendant replied, "[T]hat money's gone." Lipsius did not question him: "It seemed like a clear statement." Asked why he had requested the return of his money, Lipsius testified, "You know, nothing happened. I didn't have any paperwork. It was unsecured. It was, you know, I didn't get any money yet. It didn't seem professional to me. It didn't seem like a safe investment." However he "continued to press [defendant] for paperwork," i.e., "[t]o, at

7

least, show some documentation that there is an investment." Defendant finally furnished a letter, dated November 7, 2000, memorializing the investment.[5]

At about this same time, Lipsius received a "mobile home contract" reflecting the sale of a mobile home in Las Vegas from Larry Kroeker to Clint and Dawn Walker. The contract recited a sale price of $27,000, of which $1,000 was to be paid upon execution and the remaining $26,000 was financed by the seller at 15 percent interest over seven years, with monthly payments of $390.23 and a balloon payment of some $16,000 at the end of the seven years. Lipsius was "surprised to hear that my money was put towards a mobile home. I thought it was a fund," meaning "like a pool of lots of mobile homes that people are paying into . . . . I didn't know that I just bought a mobile home."

By February 2001 Lipsius had begun receiving monthly payments on the home. These continued for about three years. After they stopped in February or March of 2004, he contacted defendant, who said the buyer had stopped paying "[s]o, therefore, checks are no longer coming to me." At the time of the original investment, defendant had not indicated that payments would stop if the buyer stopped paying defendant. Defendant now told him he was going to try to find a new buyer.

---

[5] "We have placed your funds into our trust account and will spend the funds to acquire, repair (if necessary) and resell bank repossessed and distress sale mobilehomes throughout the United States. Upon sale, we will hold financing contracts on the mobilehomes and we will create promissory notes that will be assigned to you as they close escrow. These notes will typically mature seven years from the date of purchase. We will be responsible for the collection of payments on the homes, which will be made on a monthly basis. In turn, we will forward to you the interest payments as they are received by us. We will send the payments to any depository you may designate. We will be responsible for any costs related to the collection efforts or foreclosure on any loan, if necessary. [¶] You will earn an annual interest rate of 15% calculated on the remaining principal balance. Prior to the assignment of your funds to a note, you will be paid monthly interest with payment due on the first of each month."

In March 2005, Lipsius wrote to defendant summarizing the history of the investment. He wrote that defendant had promised to make payments to him regardless of whether the purchaser had stopped paying defendant. He called upon defendant to continue the monthly payments to which they had agreed. He also related his discovery, through his own investigation, that defendant had sold the Walker home to someone else in November 2004. He had not paid off Lipsius's interest or contacted him about the sale. Lipsius learned that he had no interest in the mobile home, i.e., "[t]here was no record of me being associated with that mobile home." That discovery led him to contact Larry Kroeker, the named title-holder, who added Lipsius to the title as a lienholder.[6]

In any event, defendant apparently continued to recognize that Lipsius had an interest in the home. At some point it was resold and payments resumed for a while, though they had stopped again, as he testified, "pretty recently." Lipsius contacted defendant, who said the buyer had gone bankrupt. At that time, apparently, defendant had "assigned the entire interest of the mobile home" to Lipsius. Lipsius ultimately sold the home for $7,000, which he described as "a huge loss."

Asked whether he had, "at some point, contact[ed] the authorities about the defendant not paying" him, Lipsius replied that he had done so "about 2002 or something." However, he responded affirmatively to the question that "it would have been after" the payments initially stopped in 2004.

### F. Jacobs Investment

Enedina Jacobs had apparently known defendant longer than any other victim; she first met him when he was working for a large nationwide investment house, where he

---

[6] As entered into evidence, the contract bore an undated attachment by which Larry Kroeker expressly assigned a "25,000.00/26,000.00 interest" in it to Lipsius. The assignment recited that monthly payments of "$375.22 principal and interest" would be paid to him for seven years, "at which time any remaining unpaid principal and interest shall become due and payable. All terms and conditions of the Note [*sic*] shall apply."

helped her open an account.  When he started his own company, he asked whether she would like to invest with him.  She agreed to do so, "since he was the only one [she] knew" at the investment house and she "thought he was a nice young man."  He originally placed her funds into a mutual fund, which she recalled as a good investment.  He gave her timely advice to liquidate that investment about a month before the market crashed in October 1987.  After her husband died in 1997, defendant placed all her IRAs in a money market fund that paid quite well.

In September 2001 defendant called her and said he wanted to talk to her about something.  She went to his office, where he "presented this mobile home thing about buying repossessed mobile homes and then fixing them up and selling them to people."  As she understood it, when someone purchased a mobile home, she "would be the lender, and then they would owe [her] for that home."  Initially her money would "go into a holding company," where it would remain until defendant found a buyer for a mobile home.  The rate of return would be "like 16 percent," of which "one percent would go to the company and 15 would go to me."  He told her it was a "good investment" and a "sure thing."  She asked what would happen "if someone does not pay," and "He said, well that's no problem.  We will repossess it and we'll sell it to someone else like the banks do."  Alluding to some rental properties that he knew she owned, he told her that "nothing can go wrong.  The people are going to be paying you.  You know how you do when you rent a house, people pay you, and that's it."

Defendant presented her with a "piece of paper" placing some or all of her holdings in a bank or "trust company" for "safekeeping."  She transferred about $133,000.  He immediately withdrew $15,000, and by the end of the month had withdrawn all but $1,200 or $1,300.  The speed of these withdrawals troubled her, but she "really trusted him," having "been with him all these years."  She trusted "that he knew

what he was doing and that he was working for my benefit, because he's known me for many years and he knew where I had my money before, which was safe."

When she made the transfers she was 70 years old. Afterwards defendant never contacted her. When she contacted him and asked what was going on, he would tell her "you'll be hearing from me probably in this next month, you know. You'll be having a sale or whatever." Her daughter urged her to get a prospectus, which defendant finally provided in 2003. In July of that year he assured in person her that her money "is here with me and it's safe. You've been getting money from day one. You've been getting interest." At her request, he "put this in writing" by a letter dated July 1, 2003. Afterwards she "realized he was avoiding me," and learned that he had made payments to persons who invested later than she had. She consulted counsel. Letters from two lawyers failed to produce any response.

### G. *Amarant Investment*

John Amarant was 65 years old in September 2002 when he invested $90,000 from his IRA in the mobile home venture. Defendant told him, among other things, that the funds he invested would be used to refurbish units so as to increase their value. His funds would earn 14 percent "whether they went into a mobile home or not." Defendant did not disclose that he could use the money for his personal needs, that it would be commingled with his operating funds, or that it might be used to pay returns to other investors unrelated to Amarant's investment. Nor did defendant tell Amarant that he might have a conflict of interest in that he was buying and selling interests in the mobile homes for his own and others' accounts.

Amarant received two notes reflecting mobile home units in which he had an interest. The first was a note for $22,500, in which his share was $12,918, between defendant and Marvalynn Woods. That note yielded monthly payments of $240 for about three years beginning in January 2003. After they stopped, defendant told Amarant he

11

had lost contact with the owner and could not find her without incurring costs to track her down, adding that Amarant was free to pursue the matter himself. Eventually Amarant learned that "absolutely no refurbishing" had been done on the unit, and that the park in which it was located would "have problems selling it because it was not up to code." The manager said they were foreclosing on the record owner for default in space rent, and that they were "doing whatever they do to get rid of that unit." Eventually he was told it had been demolished. When he asked defendant for "an accounting" for purposes of showing a loss on his taxes, he "got nothing." He testified that when the note went into default, the remaining principal was $8,581.

Amarant's second note was an $8,167 interest in a $29,900 note between defendant and Dennis and Phyllis Akin. That note began yielding monthly payments in March 2003 and was still paying at the time of trial.[7] There was $4,455 remaining in unpaid principal.

So far as Amarant knew, the remainder of his $90,000 investment—some $68,915—was never allocated to a mobile home. Despite repeated requests, he never received any accounting for these funds. When he learned defendant had filed for bankruptcy, he submitted a claim for $99,000, on which he received slightly over $6,200.

### H. Kloepfer Investment

James Kloepfer was 66 years old when, on May 29, 2003, he made his first investment in the mobile home venture. He had gone to defendant's office to take advantage of an advertisement defendant placed offering free notary services. While notarizing an instrument for Kloepfer, defendant told him about "a good investment,

---

[7] More precisely, it was two months in arrears, but this was normal. Apparently payments were still being made through defendant's office, and according to Amarant, he "always ha[d] to call" and talk to an employee there "to find out when the payments are going to be made." She had apparently told him that "[t]here[] [were] checks ready, I'm waiting for Ken the sign them."

something that I could invest in that would not only help me but it would help the people that were looking for a home. He made it sound like a very good green-type investment." He indicated that there would be a 13 percent return on the investment. Kloepfer did not recall defendant saying anything about conditions under which he would not get paid. Defendant "never got into the negative aspects of this whole loan."

Kloepfer apparently invested a total of $54,280 in the mobile home venture, of which at least $29,280 came from his IRA. Defendant did not indicate that the investment would be inappropriate for an IRA. Kloepfer was receiving payments on one note at the time of trial, and another had been paid off. His dealings with defendant led him to file complaints with the Department of Corporations and the National Association of Securities Dealers.

### I. *Stombs Investment*

Geraldine Stombs was 72 years old in 2004 when she contacted defendant after seeing a newspaper ad for an investment yielding 13 percent. She met with defendant at his office in Aptos and talked with him about the investment for probably an hour and a half. He made various representations about the investment. He did not tell her about any investigations of him by any licensing regulators, or about any actions taken against his licenses. He did not tell her that her funds would be commingled with his operating funds. He did not say that he might have a conflict of interests in buying and selling interests in mobile homes for his own account and the accounts of others. He did not tell her that her funds would be used for operating expenses and to pay returns to other investors totally unrelated to her investment. Nor did he say that she would have no enforceable security interest in any mobile home. The ad she saw said these were first mortgage notes; she believed she was investing in fully secured first mortgages.

She invested $20,000 in the venture in May 2004. Defendant placed $10,000 of it in a unit in Hollister, which apparently failed to yield any payments at all. Apparently

13

this $10,000 was eventually placed in a home in Reno that yielded sporadic payments. Some of the checks were interest only; some were principal and interest. She estimated that the outstanding debt on that note was "somewhere over $9,000."

When the initial $10,000 investment yielded poor results, Stombs asked defendant to return the remaining $10,000. He claimed an inability to do so, offering different explanations at different times. She had a lawyer write defendant a letter regarding return of the $10,000. Defendant called her and said there was no need for that, "It was certainly safe and that he was working on it and trying to put me into a mobile home." He did eventually put it into a home, "[b]ut it was just as worthless as the other one." After maybe five payments the borrower stopped paying.

### J. Fabiszewski Investment

Michael Fabiszewski invested $60,000 in the mobile home venture on December 5, 2003. On January 20, 2005, defendant sent Fabiszewski a letter stating among other things that Fabiszewski had been "assigned $20,000.00 into the Levario note (MH040902)" on August 1, 2004, and that "[t]he remaining balance of $40,000.00 plus accrued interest is still to be assigned." In fact the $40,000 was never invested into any mobile homes. Fabiszewski received some payments, but they eventually stopped. When he contacted defendant about the nonpayment, defendant would say, "Don't worry. Things take time. You will get your money." After learning defendant was going into bankruptcy, Fabiszewski contacted authorities, including the Santa Cruz District Attorney's Office and the Securities and Exchange Commission, the Department of Corporations, or perhaps both.

### K. Lewis Investment

Lowell and Kathleen Lewis were the named victims in counts 7 and 17 of the information, which, respectively, charged defendant with theft from an elder (Pen. Code, § 368, subd. (d)) and false statements and omissions in connection with an offer of a

14

security (Corp. Code, §§ 25401, 25540, subd. (b)). The trial court eventually acquitted defendant on these counts, but the facts concerning these investments remain relevant for reasons discussed in part IV, *post*.

Mr. Lewis invested in the mobile home trust in 2000, but died in 2002. The prosecution therefore attempted to prove these counts through the testimony of the Lewises' son in law, Ronald Moore, who had assumed responsibility for inventorying their assets and liabilities. Mr. Lewis's records showed that he had written two checks to the mobile home trust for $150,000 and $25,000 on August 4, 2000, and January 23, 2000, respectively. It also appeared that beginning in September 2000, Lewis had received eight monthly payments from the mobile home venture totaling $14,812.50. Although Lewis was "a meticulous record keeper," Moore found no prospectus or similar disclosures concerning the mobile home venture among Lewis's records. In a conversation with Moore around January 2003, defendant "acknowledged the loans" but said "he was not capable of making paybacks of any kind." Moore's wife—Lewis's daughter—obtained a civil judgment against defendant for some $565,000 in "[p]rincipal," interest, "damages," punitive damages, and costs, including attorney fees.

### L. Proceedings

A 22-count indictment was filed on March 26, 2009. The first three counts charged theft by false pretenses (Pen. Code, § 532, subd. (a)) with respect to the victims Lipsius, Fabiszewski, and Montgomery. Counts 4 through 10 charged theft from an elder or dependent adult (Pen. Code, § 368, subd. (d)) with respect to the remaining seven victims, i.e., Jacobs, Amarant, Kloepfer, Lewis, Perdue, Stombs, and Repetti. Count 11 charged sale of unregistered securities (Corp. Code, §§ 25110, 25540, subd. (a)). Count 12 charged sale of a security by a fraudulent device, scheme, or artifice, in that defendant "did willfully and unlawfully engage . . . in an act, practice, or course of business which operated or would operate as a fraud or deceit . . . in connection with the offer, purchase,

15

or sale of a security." Counts 13 through 22 charged, with respect to each of the 10 victims, that defendant violated Corporations Code sections 25401 and 25540, subdivision (b), in that he "did willfully and unlawfully offer securities for sale and sell securities to [victim] by means of written or oral communication which included an untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading in light of the circumstances under which they were made." It was further alleged by way of enhancements that: (1) defendant, in committing the charged offenses, "took . . . property of an aggregate value exceeding . . . [$200,000], and that these aggregate losses . . . arose from a common scheme or plan" (see Pen. Code, §§ 12022.6, subd. (b), 12022.6, subd. (a)(2)); and (2) the charged offenses were "related felonies, a material element of which is fraud and embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than five hundred thousand dollars ($500,000)." (See Pen. Code, § 186.11, subd. (a)). It was also alleged that defendant was ineligible for probation (Pen. Code, § 1203.45, subd. (a)) in that he took more than $100,000. As discussed in greater detail in part I, *post*, the information also contained several pages of allegations in avoidance of the statute of limitations.

Sitting without a jury, the court acquitted defendant on counts 7 and 17, involving the Lewis victims, on the ground that the evidence was insufficient to sustain them. The court found him guilty on the remaining 20 counts and found true the allegations supporting the charged enhancements. After a delay of nearly two years occasioned in part by a motion for new trial and the illness of defense counsel, the court sentenced defendant to 15 years' imprisonment. Defendant filed this timely appeal.

16

## I. Statute of Limitations

### A. Preservation for Appeal

Defendant contends that 10 of the 20 charges of which he was convicted were not brought within the time allowed by the statute of limitations. He points to no specific request for a ruling on this issue in the trial court, and no explicit ruling by that court. In their initial briefing, both parties assumed that the issue of timeliness was "jurisdictional" and could thus be raised for the first time on appeal. However, both relied for this proposition on *People v. Chadd* (1981) 28 Cal.3d 739, 757 (*Chadd*), which is inapposite and has been largely vitiated on this point. That case followed *People v. McGee* (1934) 1 Cal.2d 611, 613 (*McGee*), which declared that the statute of limitations "is jurisdictional, and that *an indictment or information which shows on its face* that the prosecution is barred by limitations fails to state a public offense." (Italics added; see *Chadd*, *supra*, at p. 756; *id.* at pp. 756-757 [" 'The point may therefore be raised at any time, before or after judgment.' " (quoting *McGee*, *supra*, at pp. 613)]; *id.* at p. 757 [" '*where the pleading of the state shows* that the period of the statute of limitations has run, and nothing is alleged to take the case out of the statute . . . , the power to proceed in the case is gone' " (quoting *McGee*, *supra*, at pp. 613-614, italics added)].)

This case differs from *McGee* and *Chadd* in that the information here, while alleging offenses outside the nominal limitations period, contains three and a half pages of allegations in avoidance of the statute. (See pt. I(B), *post*.) Thus it is alleged that defendant moved out of the state permanently in November 2005, that he gave various assurances to investors, including that "their money was earning interest regardless of whether it was being paid to them," and that he "offered a variety of excuses or avoided contact with the victims when he was asked why they were not being sent checks regularly." As a result of these and other matters, it is alleged, "the victims herein could

17

not, in the exercise of reasonable diligence, have discovered a loss by criminal agency prior to April 2005."

Defendant has not challenged the sufficiency of these allegations to avoid the statutory bar as a pleading matter. Accordingly they must be understood to take the case outside the holdings of *McGee* and *Chadd*. Because of this fact, and in light of other authorities mentioned below, we asked the parties to submit supplemental briefs concerning the extent, if any, to which defendant was required to expressly contest the prosecution's allegations of delayed accrual at trial, as a predicate for asserting the statute on appeal. Their responses confirm our impression that the question is a difficult one. The difficulty is illustrated by respondent's assertion of two points that seem at odds with each other: first, that defendant "forfeited his challenge to the statute of limitations by failing to put the prosecution to its proof" in the court below; second, that "where an accusatory pleading includes statute of limitations tolling allegations that the action was timely, but the defendant does not dispute the tolling and the prosecution does not explicitly tender the limitations issue to the trier of fact, the appellate court may review the evidence to determine whether sufficient evidence supported a finding that the action was timely prosecuted."

We find no clear rule for cases where the offense was committed outside the nominal statutory period, the accusatory pleading contains allegations in avoidance of the statute, and the defendant does not secure an express ruling from the trial court concerning the timeliness of the action. In *Cowan v. Superior Court* (1996) 14 Cal.4th 367, the question was whether a defendant charged with capital murder—an offense for which there is no statute of limitations—could be convicted of voluntary manslaughter, on a plea of guilty, after the statutory period for prosecution on that charge had expired. The court recognized that if the statute were truly "jurisdictional" in the sense that it limited the trial court's fundamental power to act, a guilty plea would not produce a valid

18

conviction, because subject matter jurisdiction, in that fundamental sense, " 'cannot be conferred by the mere act of a litigant, whether it amount to consent, waiver, or estoppel.' " (*Id.* at p. 372, quoting *People v. Chadd*, *supra*, 28 Cal.3d at p. 757.) Accordingly, to accommodate the situation there presented, the court made what it called a "slight adjustment" to its "analysis" in *McGee* (*id.* at p. 373), ultimately overruling that decision "and its progeny, to the extent it suggests a court lacks fundamental subject matter jurisdiction over a time-barred criminal action" (*id.* at p. 374). However the court declined to reach the issue "whether we should overrule these cases entirely and hold that the statute of limitations in criminal cases is an affirmative defense, which is forfeited if a defendant fails to raise it before or at trial." (*Ibid.*) Two of its members concurred in the result but dissented from the majority's failure to take this further step. (*Id.* at pp. 383-393 (conc. and dis. opn. of Brown, J., joined by Kennard, J.); see *id.* at p. 378 (conc. opn. of Baxter J.) [expressing openness to making statute an affirmative defense "[w]ere the facts of this case subject to a forfeiture analysis"].)

In *People v. Williams* (1999) 21 Cal.4th 335, 337, 338, 340, the court flatly rejected continued entreaties by two of its members to make the statute of limitations an affirmative defense. (See *id.* at p. 347 (dis. opn. of Kennard, J.); *id.* at pp. 347-351 (dis. opn. of Brown, J., joined by Kennard, J.).) At the same time, the court declined to reach various issues not presented by the facts there, and failed even to acknowledge the question with which we are confronted: what steps, if any, a defendant must take to preserve the issue of timely prosecution for appeal when the accusatory pleading sufficiently pleads facts in avoidance of the statute.

Conventional procedural principles suggest a reasonably straightforward answer. Where a charge has not been brought within the statutory limitations period, it is the prosecution's burden to plead facts in avoidance of the statute. (*In re Demillo* (1975) 14 Cal.3d 598, 601.) When the prosecutor does so, a defendant's plea of not guilty is

19

sufficient to put those allegations at issue. (Pen. Code, § 1019 [not guilty plea "puts in issue every material allegation of the accusatory pleading . . . ."].)  It follows, and appears also to be settled, that at trial the prosecution has the burden of proof on the issue, although the *standard* of proof is a mere preponderance of the evidence rather than proof beyond a reasonable doubt.  (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369, review den. Feb. 25, 2009.)  If the matter is then tried to a judgment of conviction, a reviewing court will infer findings "in favor of the judgment on all material issues." (*People v. Williamson* (1979) 90 Cal.App.3d 164, 170; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1359.)  Thus, where the statute of limitations is a material issue, the judgment includes an implied finding that prosecution was timely.  (See *People v. Butler* (2003 31 Cal.4th 1119, 1127 [where trial court orders HIV testing without stating reasons, "the appellate court will presume an implied finding of probable cause"].)  That finding must be upheld on appeal if it is supported by substantial evidence.  (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139; *People v. Rios* (2013) 222 Cal.App.4th 542, 559.)  However, it is open to the defendant to challenge such an implied finding on the ground that it is *not* supported by substantial evidence, and that challenge is cognizable on appeal without any predicate objection or argument in the trial court.  (See *Butler*, *supra*, 31 Cal.4th at p. 1126; 6 Witkin, Cal. Procedure (5th ed. 2012) Reversible Error, § 43, p. 573 ["Sufficiency of the evidence is a question necessarily and inherently raised in every contested trial of any issue of fact, and it requires no further steps by the aggrieved party to be preserved for appeal."]; *People v. Castillo*, *supra*, 168 Cal.App.4th 364, 369, fn. 2 ["a challenge to the sufficiency of the evidence is forfeited in the trial court only by failure to file a timely notice of appeal"].)

We would not hesitate to pronounce this approach correct but for two decisions suggesting that where the accusatory pleading contains allegations in avoidance of the statute of limitations, a defendant must "put the prosecution to its proof" on those

allegations—meaning something more than entry of a not-guilty plea—in order to contest on appeal the sufficiency of the evidence to establish timeliness of a prosecution. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 794, review den. Jan. 30, 2013 [" '[T]he statute of limitations is a substantive matter which the prosecution must prove by a preponderance of the evidence *if the defense puts the prosecution to its proof*.' " (quoting *People v. Le* (2000) 82 Cal.App.4th 1352, 1360)]; *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1281, review den. Apr. 7, 2007 ["where the information alleges facts that avoid the statute of limitations bar, defendant must raise the limitations issue in the trial court or it is forfeited"]; see *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1439.)

We question these holdings on several grounds. To begin with, neither explains their evident departure from the conventional procedural principles we have enumerated above. Both seem to posit some obligation on the part of the defendant to explicitly remind the prosecutor and the trial court of matters the prosecutor is required to prove, on pain of excusing the latter from the duty of all pleaders to substantiate their allegations with evidence. Neither decision identifies any foundation for such an obligation in existing precedent or doctrine.

Neither decision prescribes a procedure for "putting the prosecution to its proof," a phrase that ordinarily refers to the effect of a *pleading denying the opponent's affirmative allegations*—such as a plea of not guilty—as distinct from an admission of those allegations (as by plea of guilty), or reliance on an affirmative defense. (See, e.g., *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 181, fn. 63 (dis. opn. of Lucas, C.J.) [statutory limitations on appellate review after guilty plea are one factor a defendant considers "when deciding whether to plead guilty or to put the People to proof at trial"]; *People v. Lucas* (1995) 12 Cal.4th 415, 438, 443 [where counsel had supported evidentiary objection by offering to "abandon any voluntariness claim," sparseness of appellate record on that issue was attributable not to incompetence of trial counsel but to

21

"the reality that the issue was not fully litigated below and that the People were not put to their burden of proof"].)  The oldest cases use the phrase to refer to the efficacy of responsive pleadings in civil actions.  (*Levinson v. Schwartz* (1863) 22 Cal. 229, 231 [denials of debt in defendant's answer were "insufficient to put the plaintiffs to their proof" where they were "clearly insufficient to raise any issue upon any material fact"].)[8]  In this regard a plea of not guilty is comparable to a general denial in a civil action, which is said to "put the plaintiff upon proof of everything necessary to maintain the action." (*Sullivan v. Cary* (1860) 17 Cal. 80, 85; see *Hastings v. Dollarhide* (1861) 18 Cal. 390, 391; cf. Pen. Code, § 1019.)  The phrase is also used, somewhat oxymoronically, to describe the "defense" of contending that the plaintiff's or prosecutor's evidence is insufficient to carry his burden of proof—as distinct from offering a specific defense theory such as misidentification.  (E.g., *People v. Valdez* (2004) 32 Cal.4th 73, 148 (dis. opn. of Chin, J.) ["The defense was to put the People to its proof."]; *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 134-135 [defendant failed to assert exhaustion defense, but "elected to put [plaintiff] to his proof before a jury"].)

It is true that the phrase is sometimes given a meaning so abstract as to encompass any act or circumstance that triggers an opposing party's obligation to prove facts

_____

[8] In one narrow variant of this usage, a responsive pleading in a quiet title action may be held defective as a disclaimer of interest, thus exposing the defendant to a cost award (see Code Civ. Proc., § 761.030, subd. (b)), where it is so equivocal as to put the plaintiff to his proof.  (See, e.g., 7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 110, p. 649, quoting *McMorris v. Pagano* (1944) 63 Cal.App.2d 446, 452 ["[I]f defendants wished to invoke the statutory protection against a cost award, 'they should not have raised the issue on plaintiff's possession and other material issues alleged, and put him to his proof.' "]; *Brooks v. Calderwood* (1868) 34 Cal. 563, 565 [to same effect; "defendants denied [plaintiff's] allegation of possession, and put him to his proof"]; *San Mateo Community College Dist. v. Half Moon Bay Ltd. Partnership* (1998) 65 Cal.App.4th 401, 417 [by taking position on ownership of property, defendants "put the District to its proof"].)

essential to a claim or defense. (See, e.g., *Sutter Health v. Unite Here* (2010) 186 Cal.App.4th 1193, 1209 [where trial court refused to instruct on actual malice, defamation plaintiff "was not put to its burden of proof on that element"]; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 770 [criminal defendant seeking to suppress evidence "should be entitled to put the prosecution to its proof, and to test the legal sufficiency of facts asserted in support of a search or seizure, without forfeiting the chance to prove later that the testimony of the officers was false"]; *Armenta ex rel. City of Burbank v. Mueller Co.* (2006) 142 Cal.App.4th 636, 653, fn. 5 (conc. & dis. opn. of Vogel, J.) [while plaintiff was "certainly entitled to plead inconsistent theories of recovery," defense motions for summary judgment "put her to her proof"].) At this level of abstraction, however, it verges on disingenuous to predicate a forfeiture on a defendant's failure to "put the prosecution to its proof." As we have said, so long as the burden of pleading timeliness rests on the prosecution, the defendant puts that question at issue by entering a plea of not guilty. If the defendant is required to employ a specific procedure to tender the issue, the nature of the requirement should be clearly delineated *before* a forfeiture is imposed for failing to fulfill it. To date this has not occurred.

However we need not decide whether defendant's not-guilty plea was sufficient to preserve an appellate challenge to the sufficiency of the evidence because we have concluded that the record adequately shows that the issue of timeliness was tendered to, and impliedly decided by, the trial court. On the first day of trial, immediately after entering his initial appearance, the prosecutor informed the court of a stipulation that, "as far as the statute of limitations [i]s concerned, . . . Mr. Doolittle has moved out of the state in, I think, November of '05, and . . . the statute is then tolled for the time period up until the filing of the complaint, which is less than three years." He reiterated the point at the close of trial: "I want to confirm that defendant moved out of this state permanently in October—I believe it was in October of '05 and was out of the state and continues to

23

be out of the state until this date." The trial court asked, "Is that stipulation with respect to statute of limitations and other issues?" The prosecutor replied that it was. At the court's behest, both defense counsel and defendant personally acceded to the stipulation.

It is plain from these proceedings that both parties intended to place the timeliness or untimeliness of the action before the court, and that the court recognized the question as one thus tendered. The stipulation demonstrates that the prosecutor was aware of his burden of proving timeliness and that the need for a finding on that issue was brought to the trial court's attention. Thus, assuming something more than defendant's plea was required to "put the prosecution to its proof," we believe these explicit references to the issue by both parties and the court were sufficient to have that effect. It follows that the judgment of conviction includes an implied finding that the prosecution was timely, and that defendant is entitled to challenge the sufficiency of the evidence to support that finding. We now turn to that question.

### B. Statutory Period, Tolling, and Commencement of Action

The statute of limitations establishes a time period within which a prosecution must be commenced, or be forever barred. Paradigmatically the period commences—the cause of action "accrues"—when the objective facts constituting the offense are complete. For some offenses, however, accrual can be delayed by certain conditions, such as concealment of the offense. In addition, the running of the statute can be suspended ("tolled") by other circumstances, such as the defendant's absence from the state. Thus the application of the statute to a given charge depends on four variables: (1) the limitations period applicable to the offense; (2) the time, if any, during which the statute was tolled (3) the date on which the cause of action accrued; and (4) the date on which prosecution for the offense commenced. If the time between the latter two dates exceeds the sum of the first two variables, the prosecution is barred.

24

Here three of the four variables are reasonably clear, though two of them suffer from a confused record. The clearest element is the applicable limitations period, which both parties concede is four years. This follows because the 10 challenged counts sound in theft by false pretenses (Pen. Code, § 532, subd. (a)), theft from an elder or dependent adult (Pen. Code, § 368, subd. (d)), or false statements and omissions in connection with an offer of securities (Corp. Code, §§ 25401, 25540, subd. (b)). These three offenses are among those enumerated (Pen. Code, §§ 803, subds. (c)(1), (c)(3), (c)(11)) as subject to a four-year limitations period (*id.*, 801.5).

The second variable as to which there is no active contention between the parties is the date the prosecution commenced. It is alleged in the information that the prosecution commenced with the issuance of a warrant for defendant's arrest on March 25, 2009. (See Pen. Code, § 804, subd. (d).) Both parties treat this allegation as determinative. However, the clerk's transcript includes a felony complaint filed September 24, 2008. It also contains minutes indicating that defendant was arraigned on the complaint on October 9, 2008, at which time he entered his plea of not guilty.[9] Penal Code section 804 provides that for purposes of the statute of limitations, "prosecution for an offense is commenced when any of the following occurs:  [¶]  . . .  [¶]  (c) The defendant is arraigned on a complaint that charges the defendant with a felony." It thus appears on the face of the record that the prosecution in fact commenced on October 9, 2008. We accept that date in support of the judgment, notwithstanding the parties' reliance on an unsubstantiated allegation to a different effect.

The third point as to which there is no active controversy is the tolling of the statute by defendant's absence from the state. It was ultimately stipulated that defendant

---

[9] The complaint in turn contains an allegation that an arrest warrant had issued on September 19, 2008. However, the record contains no such warrant, nor any other evidence substantiating this allegation.

left California "permanently" in October or November of 2005. Unfortunately, the parties' failure to precisely fix the date of departure makes it impossible to determine the exact tolling period. A defendant's absence tolls the statute for "a *maximum* of three years." (Pen. Code, § 803, subd. (d), italics added.) The tolling period necessarily begins on the date of departure and ends three years later, or when prosecution is commenced, *whichever comes later*. If less than three years elapse between departure and the commencement of prosecution, the period of tolling is necessarily limited to this actual time. That variable cannot be calculated unless its beginning and end are fixed to the day.

It was alleged, and defendant testified, that he left the state in the first week of November, 2005, which is less than three years before October 9, 2008, when the prosecution commenced. Because the presumption of correctness favors the implied finding of timeliness, we will construe the record so as to provide the longest tolling period consistent with its more specific contents. So construed, it imports a departure date of November 1, 2005. From this it follows that when the prosecution commenced, defendant had been absent from the state for 1073 days, i.e., two years and 342 days, taking account of an intervening leap day.

It follows that for prosecution to be timely as to a given charge, not more than six years and 342 days must have elapsed between the accrual of that charge and the commencement of prosecution. Subtracting that period from October 9, 2008, yields a cutoff date of November 1, 2001. The question thus presented is whether substantial evidence supports the trial court's implied finding that each of the challenged charges accrued on or after November 1, 2001.[10]

---

[10] The criminal statute of limitations is computed in the same manner as in a civil case, i.e., the day on which the cause of action accrues is not counted, and the action is timely if commenced on the last day specified by the statute, i.e., the anniversary (in this case the fourth anniversary) of the accrual date. (*People v. Twedt* (1934) 1 Cal.2d 392,

## C. Accrual

This brings us to the real nub of the dispute, which is when the challenged charges accrued. The governing statute declares that the statutory period begins to run upon "the discovery of [the] offense." (Pen. Code, §§ 803, subd. (c), 801.5; see 1 Witkin & Epstein, Cal. Criminal Law, *supra*, § 252, p. 738-739.)[11] Although the statute speaks in terms of actual "discovery," it has long been construed to mean that the cause of action accrues when the victim knows of facts sufficient to put a " 'reasonably prudent man' " on inquiry as to the presence of fraud. (*People v. Zamora* (1976) 18 Cal.3d 538, 562, quoting Civ. Code, § 19.) This places a burden of diligence upon the complaining party, who is charged with knowledge of all facts a reasonably prudent person would have learned from whatever inquiry was warranted by the facts actually known to him.[12] (See *Zamora, supra,* at pp. 561-562.)

---

399, citing Code Civ. Proc., § 12; see *People v. Clayton* (1993) 18 Cal.App.4th 440, 444; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 248, p. 733.) In the digital age, the same result is obtained by simply adding or subtracting values using any spreadsheet application with the appropriate formats and functions.

[11] "A limitation of time prescribed in this chapter does not commence to run until the discovery of an offense . . . a material element of which is fraud or breach of a fiduciary obligation, the commission of the crimes of theft or embezzlement upon an elder or dependent adult, or the basis of which is misconduct in office by a public officer, employee, or appointee . . . ." (Pen. Code, § 803, subd. (c).)
"Notwithstanding Section 801 or any other provision of law, prosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later." (Pen. Code, § 801.5.)

[12] Critically, the existence of facts sufficient to put a victim "on inquiry" does not by itself commence the running of the limitations period. Rather, the victim is charged with knowledge of *facts* that *would have been discovered* through reasonably diligent inquiry: "[O]nce placed on inquiry notice . . ., an investor must perform a reasonable investigation into the possibility of fraud. (*Bamberg v. SG Cowen* (D.Mass. 2002) 236 F.Supp.2d 79, 85.) An investor who fails to fulfill this duty of inquiry will be charged with the *knowledge of what an investor in the exercise of reasonable diligence would*

27

Also, while the statute is silent with respect to *whose* discovery will commence the running of the limitations period, it appears to be settled that discovery occurs for purposes of the criminal statute of limitations "when either the victim or law enforcement learns of facts" sufficient to constitute discovery. (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1061; see *id.* at p. 1065 [instruction erroneous because it failed to inform jury that conviction was barred "if it found a *victim* could have reasonably discovered the crimes" outside limitations period]; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 330-331 ["Although the statute is silent on the subject, the limitations period of section 800 has been construed . . . as commencing from the date either the *victim* or *law enforcement personnel* learn of facts which, when investigated with reasonable diligence, would make that person aware a crime had occurred."]; see *id.* at p. 331, fn. 7 ["California appears to be one of only five of at least twenty-one states with a tolling statute related to discovery which fails to designate the specific persons who qualify as 'discoverers.' "].)[13]

---

*have discovered* concerning the fraud, and this knowledge is imputed as of the date a diligent investigation would have turned up evidence sufficient to establish a cause of action. (*Berry v. Valence Technology, Inc.* (9th Cir.1999) 175 F.3d 699, 704, 706 & fn. 9.)" (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 428, italics added; see *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 131.) It is thus open to even the most negligent victim to argue that a reasonably diligent inquiry, if conducted, would not have uncovered the fraud.

[13] The rule commencing the statutory period upon discovery by a private victim may not adequately take account of situations in which victims have a material incentive *not* to report a crime—particularly in cases like this one, where multiple victims have suffered economic losses the combined value of which exceeds the perpetrator's ability to make them all whole. In such circumstances each victim's top priority may be obtaining what recompense he can before other victims exhaust available sources of relief. This interest may be jeopardized by attracting attention to the perpetrator's conduct. This raises the question whether the public interest in prosecuting the perpetrator should depend for its vindication on the willingness of victims to act against their own material interests.

In light of this concern we question whether the rule making the victim an eligible "discoverer" for purposes of the criminal statute of limitations has been adequately

28

Here it is not suggested that law enforcement authorities, or any other representatives of the public interest, discovered or should have discovered the offenses at issue before November 1, 2001.  The question thus becomes whether the various victims of those offenses, or any of them, did or should have done so.  As already mentioned, "discovery" for these purposes requires only *constructive* knowledge.  However, a victim has not constructively discovered the offense if the facts " 'would have only created a suspicion of wrongdoing.' " (*People v. Crossman* (1989) 210 Cal.App.3d 476, 481.)  "[I]t is the discovery of the crime, and not just a loss, that triggers the running of the statute."  (*People v. Lopez* (1997) 52 Cal.App.4th 233, 246, fn. 4; see *Crossman*, *supra*, at p. 481 [discovery " 'requires an awareness the loss occurred *by virtue of a criminal agency*.  Thus, "discovery" calls for awareness of the crime, not merely the loss' " (quoting *People v. Kronemyer, supra,* 189 Cal.App.3d at p. 334)].)  More particularly, "the loss of an investment is not necessarily a legal injury, as many investors have good reason to know."  (*Cleveland v. Internet Specialties West, Inc.* (2009) 171 Cal.App.4th 24, 32.)  A fortiori, investment losses or disappointments do not necessarily establish the commission of a crime, or facts sufficient to give constructive notice of same.

Moreover, even when facts are sufficient to arouse suspicion in a reasonable victim, subsequent reassurances by the defendant may operate to reasonably allay concerns and delay the discovery of the fraud.  (See *Garrett v. Perry* (1959) 53 Cal.2d 178,181-182 [trial court could reasonably find that plaintiff's suspicions "were allayed by

explained.  The case where it apparently originated offers what we find an unconvincing, if not unintelligible, rationale.  (See *People v. Swinney* (1975) 46 Cal.App.3d 332, 344, disapproved on another point in *People v. Zamora* (1976) 18 Cal.3d 538, 565, fn. 26.)  While the Supreme Court seemed to accept such a rule in *Zamora*, *supra*, at pp. 571-572, it appears never to have explicitly assessed its soundness in any context, let alone that of economic crimes against multiple victims.

29

defendant's subsequent reassurances"]; *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 966 ["Even if the plaintiff discovers some suspicious circumstances, his reliance is reasonable if the defendant allays his doubts with further assurances."]; *Brownlee v. Vang* (1965) 235 Cal.App.2d 465, 476 [defendant's "[f]urther representations. . . , designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant."]; *Blackman v. Howes* (1947) 82 Cal.App.2d 275, 279, ["A buyer is not chargeable with knowledge of conditions which he fails to discover because of some deception of the seller. [Citations.] When . . . the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud. [Citation.]"].)

In addition, the burden of reasonable diligence otherwise placed upon the victim may be relaxed when the defendant owes the victim a fiduciary duty. (See *People v. Crossman, supra,* 210 Cal.App.3d at p. 482, citing and quoting *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 439-440; see *Alton v. Rogers* (1954) 127 Cal.App.2d 667, 680 [confidential relationship between parties entitled plaintiff to rely on defendant's many reassurances, thus delaying constructive discovery].)

We now evaluate the evidence concerning each of the challenged counts in light of the foregoing principles.

### D. Lipsius

Defendant alludes to testimony by Jeffrey Lipsius that when documentation of his investment was not immediately forthcoming, he had "second thoughts about the investment," to the extent that in October 2000 Lipsius asked defendant "for my money back." Defendant asserts that Lipsius's investment "went wrong from the beginning," placing him on notice more-or-less immediately of the crimes against him. But according

30

to Lipsius's testimony, what went wrong was defendant's marked tardiness in providing immediate *documentation* of the investment. This difficulty seems to have been resolved in November 2000, when defendant provided a letter acknowledging the investment. Around the same time Lipsius received a "mobile home contract" which he understood to reflect an interest in a mobile home in Las Vegas.

Defendant naturally emphasizes Lipsius's testimony that when he asked for his money back, defendant replied, "[T]hat money is gone." But Lipsius could reasonably understand this statement to mean only that the funds had been committed to the venture, not that they had been lost, let alone stolen. In contrast to some other victims, there is no suggestion that defendant had made any promises to Lipsius about returning his funds on demand, or at any other time prior to maturation of the venture. So far as the record shows, Lipsius could quite reasonably suppose, and presumptively did suppose, that his funds had been safely placed in the venture, where they were, or soon would be, earning returns.

Noting that returns on the investment were slow in coming, defendant asserts that such "[i]mmediate problems receiving payment" put victims such as Lipsius on notice of theft.[14] We have no doubt that an immediate default in performing a promised obligation may raise at least the hypothetical possibility that the promise was fraudulently made. But common experience tells us that someone undertaking performance of a promise may encounter early difficulties, and that these may rise to the level of a complete inability to perform, without necessarily pointing to fraud in the original undertaking. This is

---

[14] In support of this proposition defendant cites *People v. Bell* (2010) 197 Cal.App.4th 822. That case involved no issue of the statute of limitations. The question was whether a would-be renter who falsely identified herself to a landlord in order to get an apartment had thereby committed theft by false pretenses. Defendant quotes testimony by the landlord's manager that the defendant's delinquency in rent " 'right off the bat' " was a " 'red flag.' " (*Id.* at p. 825.) That decision appears irrelevant here.

31

particularly true where, as here, the nonperformance may betoken a *delay* rather than an outright *default* in performance. The failure to immediately perform is not necessarily sufficient to put an investor on notice of criminal conduct.

Further, the trial court could quite reasonably find that any suspicions Lipsius should have entertained during the early months of his investment were dispelled in February 2001, when defendant gave him printout from a web-based loan payment calculator apparently reflecting payments Lipsius would receive over the life of the contract. Around that same time, Lipsius began receiving monthly payments, which continued for about three years. From these facts alone it could quite reasonably be inferred that Lipsius was not on notice of any fraud until long after November 1, 2001.

Defendant also cites Lipsius's initial testimony that he called the Consumer Affairs Division to complain about defendant "[m]aybe about—I don't know—about 2002 or something." This would certainly suggest a suspicion of wrongdoing, which might well have triggered a duty of inquiry, charging Lipsius with notice of whatever that inquiry might have revealed. But it would not establish that such a duty arose, or that Lipsius was so charged with notice, *prior to November 1, 2001*. Further, the trial court could reasonably find that the date initially given by Lipsius was mistaken. In his next answer, Lipsius agreed that his contact with authorities "would have been after" he stopped receiving payments, which occurred in 2004. For purposes of substantial evidence review, this later date must be accepted as the correct one.

The evidence is sufficient to sustain the trial court's implied finding that a reasonably prudent person in Lipsius's position would not, in the exercise of reasonable diligence, have discovered that he was the victim of fraud before November 1, 2001.

### *E. Montgomery*

The record is far from clear with respect to the course of Montgomery's investment in the mobile home venture. A major source of the confusion is the failure by

32

counsel on both sides to adequately distinguish between voluntary new investments of funds by Montgomery, and transfers or reinvestments of funds already in defendant's possession by virtue of this or earlier ventures.[15] The distinction is significant because one element of the offense of theft by false pretenses is the victim's transfer of property to the defendant. (See *People v. Wooten, supra,* 44 Cal.App.4th at p. 1842; *People v. Williams, supra,* 57 Cal.4th at p. 787.) It is debatable whether the reinvestment of funds already in the defendant's possession can satisfy this element, even if the victim's acquiescence in such reinvestment is procured by fraud. Similarly, while we express no final opinion on the point, it seems at least arguable that a transfer of invested funds by one already in possession of them does not constitute an offer or sale of a security to the original investor.

The only new investment by Montgomery that clearly appears in the record was a check for $25,000 dated November 12, 1998. This apparently went into a loan on what she called the Gerace trailer. At the beginning of her involvement, the trailer was apparently owned by one Rice, who signed a promissory note and security agreement on February 25, 1999. The trailer was apparently repossessed and sold to one White, presumably upon Rice's failure to make payments. Montgomery could not recall White's payment history, but at some point the trailer was taken over by Gerace, who made nine payments and, in January 2002, paid off the entire loan. The proceeds were then apparently reinvested, without Montgomery's knowledge or consent, in another trailer known as the Martinez trailer. At the time of trial Montgomery had received all but six of the payments due on the Martinez trailer.

---

[15] Illustrating the difficulties is the statement in respondent's brief that "[i]n reliance on [defendant's] representations . . . Montgomery transferred $11,172.86 to appellant's Mobile Home Trust account." But Montgomery testified that this sum represented the proceeds of another loan, which defendant transferred into a new mobile home without Montgomery's knowledge or consent.

Defendant argues that Montgomery was put on notice of fraud by Rice's apparent default on the original note. As we have previously noted, however, the mere failure of an investment to immediately yield the promised returns does not necessarily give notice of fraud. Any suspicion of fraud that might have been held as of February 1999 by Montgomery—or might then be imputed to her—could have been reasonably dispelled by the subsequent repossession and resale of the trailer, eventually culminating in Gerace's taking over the trailer, apparently around April or May of 2001, and paying off the entire loan by the end of January 2002. It is true that red flags might well have unfurled when defendant failed to surrender the proceeds of this transaction to her, placing her funds instead into another investment without her consent. But those events took place well after November 1, 2001, and thus within the statutory period. Nothing before us would require the trial court to find that a reasonable investor in Montgomery's position would have undertaken an inquiry into possible fraud—let alone would have been led thereby to discover it—before November 1, 2001.

### F. Jacobs

In September 2001, defendant induced Enedina Jacobs to transfer $133,000 of her funds into the mobile home venture. This was a scarce two months before the cutoff date for limitations purposes. The question is whether the trial court could properly find that Jacobs need not have discovered, *during those two months*, that she was the victim of fraud. We have no doubt that it could. Having known defendant since he worked for a large investment firm, Jacobs "trusted . . . that he knew what he was doing and that he was working for my benefit, because he's known me for many years and he knew where I had my money before, which was safe." After making the investment, she contacted him repeatedly and asked what was going on; he would tell her "you'll be hearing from me probably in this next month, you know. You'll be having a sale or whatever." In July 2003 she went to visit him and he assured her that her money "is here with me and

34

it's safe. You've been getting money from day one. You've been getting interest." At her request, he confirmed this in writing.

Far more than two months had to elapse before Jacobs could be charged with a suspicion that defendant had committed a crime against her. The trial court properly found the charges concerning her to be timely.

### G. *Perdue*

By the time he testified, Joseph Perdue was "80-something." It appears that he was suffering serious hearing problems, and possibly cognitive difficulties.[16] At least partly as a result of these matters, the circumstances of his investment were not clearly established. Letters from defendant memorialized an investment of $50,000 in October 1999 and another $50,000 in February 2000. Perdue's son Keith testified that for a little over 10 years he had been living with his father, taking care of him, and

---

[16] For instance, when a check bearing his apparent signature was shown to him, he testified that he was unable to recognize it, although he said that the signature "sure look[ed] like" his. Asked whether he remembered a passage in a letter from defendant, he testified, "I don't remember it, to tell you the truth. But like I said, he took my money and I never got it. That's the way it was. He took my money." Asked if he recalled the second $50,000 investment, he testified, "No, I don't remember it," repeating the last four words twice more. Then, asked whether his lack of memory concerned the fact of the investment or only the amount, he replied, "No, not—I was never together with him doing that stuff." Nor could he coherently answer a series of questions intended to confirm certain material omissions by defendant. When asked whether defendant had told him about any regulatory actions against him, the witness replied, "I think I—I think that I talked to some other of the men that were doing the same thing that I was doing, or thought I was doing but I wasn't doing, and there was more than one, I think, doing stuff—something to him, but I do not know. I do not know." Asked if, given such knowledge, he would still have invested with defendant, Mr. Perdue replied, "Oh yes, I would have. I would have done anything to try to get something out of him. He never gave me anything over five cents I don't think."

When defense counsel rose to cross-examine, he "interject[ed] a competence objection to Mr. Perdue." The court found the witness competent to testify, but emphasized that the governing standard was a mere preponderance of the evidence.

35

assisting with his finances.  He was aware of four successive monthly payments from defendant, totaling about $5,000, starting in March or April of 2000.  Defendant contends that the cessation of these payments, apparently by September 2000, would have put Perdue on inquiry notice some 14 months before November 1, 2001, that he was the victim of misrepresentations.

We agree with defendant that the present record is insufficient to establish delayed accrual with respect to the Perdue charges.  The record fails to establish any inquiry by Mr. Perdue, or on his behalf, after payments stopped.  It suggests no reason for delay in undertaking such an inquiry.  So far as the record shows, defendant completely defaulted on the promised undertakings a few months after making them and well before the critical date for limitations purposes.  We will therefore remand for a determination by the trial court concerning the timeliness of these charges.

### H.  Repetti

By far the most challenging of the charges with respect to application of the statute of limitations are those involving Mary Repetti.  She was 68 years old in September 1999, when she placed her first investment in the mobile home venture.  By then she had been investing with defendant, or acting under his advice, for 10 years.  She testified that her husband was initially "very skeptical" of the mobile home venture, but that defendant eventually prevailed upon the two of them to invest $100,000 of their joint funds on September 28, 1999.  Defendant memorialized the investment in a letter dated November 9, 1999, which included the statement that his firm "guarantee[d] . . . the timely repayment of principal and interest on each note that you hold throughout the duration of each note."  It also said, "The interest rate you will receive will be 15% on the remaining principal balance."

Defendant contends that Repetti was placed on notice of fraud almost immediately, when defendant failed to deliver the promised rate of return.  When asked at

36

trial whether the loans into which her initial investment was placed conformed to the defendant's representations, she answered, "Absolutely not, because right away the first receipt we received didn't have 15 percent on all the notes . . . ." This was an apparent reference to an "Investor Portfolio" furnished by defendant around February 10, 2000, listing five loans into which the Repettis' initial investment had been placed. All but one of the loans showed an interest rate below 15 percent. The inventory bears a handwritten notation of unknown date and authorship explicitly noting the discrepancy: "NOTE: Letter of 11/9/99 states 15% interest—only one (1) note is 15%."

Defendant also cites Repetti's testimony that she received payments on some loans but not others. This was a patent breach, defendant contends, of the written undertaking to "guarantee timely repayment of principal and interest on each note that you hold throughout the duration of each note." The evidence fails to establish when these additional breaches occurred, or began to occur. We do not believe the question is pivotal to the question of guilt, however, for even if we assume that Repetti should have discovered by November 1, 2001, that she was the victim of fraud, it would not follow that the counts concerning her were time-barred in view of further investments she made after that date.

The statute of limitations does not begin to run until the offense is complete. (*In re Parks* (1986) 184 Cal.App.3d 476, 479, quoting *Toussie v. United States* (1970) 397 U.S. 112, 115.) The offense is complete " 'when every act which is an element of the offense has occurred.' " (*Id.* at p. 479, fn. 6, quoting *State v. Gainer* (1980) 227 Kan. 670 [608 P.2d 968, 970].) "A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." (*People v. Wooten, supra,* 44 Cal.App.4th at p. 1842.) Such an offense is thus complete when the fraud "is

37

consummated by obtaining possession of the property sought." (*People v. Brady* (1969) 275 Cal.App.2d 984, 995; see *People v. Pugh* (1955) 137 Cal.App.2d 226, 232 [theft was complete for limitations purposes not upon execution of deed but upon performance of escrow conditions and delivery].)

Existing law has been authoritatively declared to provide that "multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft." (*People v. Whitmer* (2014) 59 Cal.4th 733, 742.) And where multiple acts of theft constitute a single continuing offense, prosecution is timely "as long as the *completion* of the course of conduct lies within the statutory period." (*People v. Keehley* (1987) 193 Cal.App.3d 1381, 1386.)[17] Here, Ms. Repetti continued to invest funds in the mobile home venture until well after November 1, 2001. She testified that she invested a total of $250,000, apparently in six payments. Her testimony suggests that the last investment may have occurred as late as 2005, though the last payment for which we find documentation in the record was on July 19, 2002. Either way, at least two of her payments were well within the limitations period.

Defendant acknowledges that these subsequent payments "complicate[]" the limitations analysis. He argues in essence, however, that if Repetti was placed on notice of fraud in 2000, when she learned of loans that did not conform to defendant's representations concerning the rate of return, she could not have *relied* on anything defendant said, or failed to say, after that date. Instead, he argues, she must have relied

---

**17** Presumably a similar analysis attends the charge that defendant violated Corporations Code sections 25401 and 25540, subdivision (b), by offering or selling securities to Mrs. Repetti by means of false statements or devices. That is, the offense requires a sale or at least an offer, and each additional investment constitutes a new sale or offer marking either a new offense, or the continuation or completion of an ongoing offense.

on her own judgment that the investments were performing adequately.  As a result, he contends, any charge based on the later investments fails for want of substantial evidence.

It is of course true that to establish criminal fraud, it must appear that the victim relied in fact on the defendant's false representations or material omissions—i.e., that " 'the false representation "materially influenced" the owner's decision to part with his property.' " (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1440-1441, quoting *People v. Wooten, supra,* 44 Cal.App.4th at pp. 1842-1843.)  However, the defendant's misrepresentations " 'need not be the sole factor motivating the transfer.' " (*Miller, supra,* at p. 1441.)  Rather there must be a " ' "causal connection shown between the [representations] alleged to be false" and the transfer of property.' " (*Ibid*.)  Defendant has failed to persuade us that the trial court, sitting as trier of fact, could not find the requisite causal connection.

First, the prosecution was not obliged to show any new or additional misrepresentations in order to predicate guilt on the later investments.  Where a victim makes multiple transfers of property to the defendant, each may support conviction even if all flow from representations predating the first transfer.  (See, e.g., *People v. Barber* (1959) 166 Cal.App.2d 735, 741-742 [defendant made "three separate, distinct and different sales of stock, all based upon false representations made before the first sale"].)  Here, the prosecution could rest on defendant's original misstatements and nondisclosures to establish the pertinent elements of the offense, so long as the offense was not *complete* until after the critical date—as it was not, at least insofar as additional payments were made and received after that date.

Second, that Repetti may have had *constructive* notice of a misrepresentation concerning the rate of return does not preclude a finding that she continued to *rely in fact* upon that misrepresentation in making later investments.  The concept of constructive notice—what a reasonable person in the victim's circumstances should have known—

applies only to the question of accrual for purposes of the statute of limitations. It has no bearing on the sufficiency of the evidence to establish guilt. Rather criminal fraud can be found without any showing that the victim's reliance was prudent or even reasonable. (See 2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 63, p. 111 ["gullibility of the victim is no defense" to theft by false pretenses; crime occurs even if "the representations are so preposterous that no reasonable person would rely on them"]; *People v. Bresin* (1966) 245 Cal.App.2d 232, 237 [" ' "[T]he guilt of the accused does not depend on the degree of folly or credulity of the party defrauded." ' " (quoting *People v. Gilliam* (1956) 141 Cal.App.2d 749, 752)]; *People v. Katzman* (1968) 258 Cal.App.2d 777, 785 ["Ignorance or negligence of the victim is not a defense to theft by false pretenses."], disapproved on another point in *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 780, fn. 11.)

Third, even if Repetti did not rely on the overstated rate of return in making later investments, she could be found, and presumptively was found, to have relied on other misrepresentations. A prosecution expert identified seven misrepresentations generally used by defendant to induce victims to invest in the mobile home venture.[18] The evidence shows that, apart from misrepresenting the rate of return, defendant made five of these misrepresentations to Repetti: that the investment was "safe"; that it would be secured by notes; that he "guarantee[d]" repayment of principal and interest on each note; that her funds would be held in a "trust account" pending allocation to a mobile home; and that the funds would be used "to acquire, repair (if necessary), and resell bank

___

[18] The expert enumerated defendant's affirmative misrepresentations to investors as (1) "that these offers were risk free"; (2) "[t]hat they were secured"; (3) "[t]hat they were . . . guaranteed"; (4) "[t]hat the money was going to be put in trust until a property was identified"; (5) "[t]hat the money would only be used for the property assigned to that particular investor and for no other purpose"; (6) "[t]hat there was a guaranteed buy-back at the investor's insistence"; and (7) "the rate of return of 11 to 15 percent, [which was] impossible under these kinds of situations."

repossessed and distress sale mobilehomes," resulting in "promissory notes [to] be assigned to you as the investor for as many homes as your funds will cover." Defendant also represented that in the event of default by a mobile home purchaser, he would "take care of all expenses." As Repetti testified, "[T]here would be no servicing charges on our part."

In addition, the expert identified seven material facts that defendant generally failed to disclose to investors.[19] None of these facts were shown to have been disclosed to the Repettis, and Mrs. Repetti testified affirmatively that at least three were not disclosed, i.e., "that . . . regulatory agencies had contacted [defendant] regarding commingling of investor funds," "that if certain conditions occurred, [she] wouldn't get paid," and that "he could use [her] money for his personal needs." She also testified that defendant failed to mention any potential "conflict of interest in him buying and selling the mobile homes [while] having interests" in them.

There is simply no basis to assume, as defendant's argument does, that notice of interest rates lower than the promised ones precluded a finding that Repetti relied on other misrepresentations or material omissions made to her.

We conclude that substantial evidence supports the judgment of conviction with respect to the Repetti counts and that those counts were not barred by the statute of limitations.

---

[19] The material omissions were defendant's failure to disclose (1) his filing for bankruptcy; (2) regulatory actions against him by the Department of Real Estate, the Department of Corporations, and the National Association of Securities Dealers; (3) "that funds would be used other than for the purposes which were described"; (4) "[t]he pooling of investor funds" (5) "that the investments were in fact unsecured"; (6) that "they were completely unsuitable as IRA investments"; and (7) "that new investor funds would be used to pay off old investors," making the venture "a classic Ponzi scheme."

41

## II. Sufficiency of Evidence

Defendant contends that his conviction on count 8, which charges that he obtained money from Joseph Perdue by false pretenses, is not supported by substantial evidence because there was no evidence of any deceit aimed at Perdue prior to his investment. For the same reason, he contends, we must reverse count 18, which charges that defendant made false statements or misleading omissions in the sale of a security to Perdue. In a supplemental brief he contends that in light these deficiencies, his conviction on these counts violated his right to due process.

The record includes three letters in which defendant memorialized Perdue's investments and recited various terms and assurances with regard to them. Defendant asserts that these written undertakings did not carry the prosecution's burden because they were only made after Perdue invested. This is an invocation of the requirement, to which we have already adverted, of "a causal connection between the false representation and the acquisition of the victim's property; i.e., the victim must have been induced to part with the property in reliance on the representation." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 59, p. 92.) Obviously a transfer of property cannot be the product of a representation that is only made after the transfer occurs. Similarly, such a representation can rarely if ever be said to have been made "in connection with the offer, sale, or purchase of a security." (Corp. Code, § 25401.)

However defendant's argument overlooks two facts concerning his written assurances to Perdue. First and most broadly, a factfinder could view the letters as evidence of undertakings and assurances given prior to Perdue's investment, and relied on by him in making it. Indeed there would be little reason for defendant to give these assurances unless he had promised to do so in order to persuade the victim to invest. Some of the assurances seem to have been tailor-made to address concerns that had, inferentially, been expressed by Perdue before the investment was made. Thus, in the

42

letter of October 4, 1999, defendant wrote that the seven-year term of the notes would "normally" mean that "an investor such as yourself would hold the note until it[s] maturity." He went on to represent, "[h]owever," that he had "made a practice of maintaining a secondary market for these notes in case an investor needs to liquidate their note for cash prior to it[s] maturity." He made a "firm commitment . . . personally" to sell Perdue's note to another client "without loss . . . should the need arise." This document supports an inference that Perdue had expressed concern about locking up his money for seven years and that defendant, in order to overcome that concern, had assured him he would guarantee the liquidity of the investment in writing. The same concern is reflected in the second letter's assurance that Perdue could "withdraw your funds from your loan to us," in whole or part, on 60 days notice, and the third letter's recital that the term of his loan would be two years and not the seven-year term contemplated for other investments in the venture. Indeed this last recital is explicitly described as an undertaking "requested" by Perdue: "You have asked that we agree to a two year term for this loan." The court could infer that all similar recitals in these letters likewise reflected assurances defendant had previously given to Perdue orally, and which had operated as inducements to invest.

Defendant's argument also overlooks the facts that Perdue invested two separate sums, and that the letter memorializing the first investment predated the second investment by about four months. It might of course be argued that the two investments were entirely divorced, such that representations made in connection with the earlier had no bearing on the later. But such an argument would be more appropriately addressed to a trier of fact, and in any event it appears unsound, particularly insofar as the earlier letter contained representations of fact concerning defendant's business customs and practices. The chief example of such a representation is defendant's statement that he "made a practice of maintaining a secondary market for these notes in case an investor needs to

43

liquidate their note for cash." The trial court could reasonably infer that this statement of historical fact—for which we see no support whatever in this record—operated as a continuing inducement, and contributed causally to the second investment.

In his reply brief defendant insists that "[n]o evidence of reliance on false representations appears in the letters" he wrote to Perdue. Again defendant overlooks the proper role of inference in the factfinding function, and our obligation as a reviewing court to indulge all reasonable inferences in support of the factfinder's determination. As noted above, the text of defendant's own confirming letters supports an inference that at least some of the assurances set forth there reflected concerns expressed by Perdue when defendant solicited his participation in the mobile home venture. It follows that Perdue relied on those assurances in agreeing to invest.

### III. Enhancement for Aggregate Losses

The trial court imposed a two-year sentence enhancement under Penal Code section 186.11, subdivision (a)(2) (section 186.11(a)(2)), based upon its finding that defendant engaged in a pattern of related felony conduct involving the taking of over $500,000.[20] Defendant contends that once the time-barred charges are set aside, and the

---

[20] Although the statute has been amended four times since its 1996 enactment, none of the amendments appear material here. As in effect from 1996 to 2005, when most or all of the conduct at issue here took place, it provided as follows: "(a)(1) Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). . . . For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events. For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on

44

corresponding losses deducted from the aggregate, the finding of losses over $500,000 cannot be sustained, and the enhancement must be stricken or reduced.

The statute predicates the enhancement on the "taking" of property with specified values.[21] (§ 186.11, subd. (a).) The relevant amount is the aggregate value of all property of which the defendant acquired possession through the offenses of which he is convicted, even if the victim subsequently recovered some or all of it, or received offsetting compensation or benefits by some other means. (See *People v. Frederick* (2006) 142 Cal.App.4th 400, 421 [where defendant "exercise[d] dominion and control over the funds," it was "proper to include them in calculating any excessive taking amounts," notwithstanding benefits provided in exchange, or partial recovery by police]; see *id.* at p. 422 [" '[T]he Legislature did not intend that the application of section 12022.6 should depend upon the fortuitous circumstances of whether the police were able

two or more separate occasions. [¶] (2) If the pattern of related felony conduct involves the taking of more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison. [¶] (3) If the pattern of related felony conduct involves the taking of more than one hundred thousand dollars ($100,000), but not more than five hundred thousand dollars ($500,000), the additional term of punishment shall be the term specified in subdivision (a) or (b) of Section 12022.6." (Former Pen. Code, § 186.11, subd. (a) (section 186.11(a), as enacted Stats. 1996, ch. 431, § 2, pp. 2719-2720; see Stats. 2001, ch. 854, § 21; Stats. 2004, ch. 182, § 49, operative July 1, 2005.)

The cross-referenced statute provides in part, "(1) If the loss exceeds sixty-five thousand dollars ($65,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of one year. [¶] (2) If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years." (Pen. Code, § 12022.6, subd. (a) (section 12022.6(a).)

[21] Subsequent amendments expanded the statutory language to include "the taking . . . *or* . . . *loss*" of specified sums. (§ 186.11(a), as amended by Stats. 2007, ch. 408, § 1, italics added.) This amendment does not appear material here.

45

to recover stolen property or the victim was able to establish a civil claim for the return of property or its proceeds . . . .' " (quoting *People v. Ramirez* (1980) 109 Cal.App.3d 529, 539)].)

Although the statute is far from a model of clarity, we understand it to contemplate that the sum triggering the enhancement will be limited to losses arising from *conduct for which the defendant has been convicted*. (See Pen. Code, § 186.11, subd. (a)(1) [defendant "shall be punished, upon conviction of two or more felonies . . . , in addition and consecutive to the punishment prescribed for the felony offenses of which he has been convicted, by an additional term of imprisonment . . . ."]; *id.*, subd. (b)(1) ["The additional prison term and penalties provided for in subdivisions (a), (c), and (d) shall not be imposed unless the facts set forth in subdivision (a) are charged in the accusatory pleading and admitted or found to be true by the trier of fact."]; cf. *People v. Lai* (2006) 138 Cal.App.4th 1227, 1250-1251 [restitution under statute is limited to compensation to victims of offenses for which defendant convicted].)

In light of these principles, defendant's challenge to the enhancement presents too many uncertainties for appellate resolution. The first is whether the Perdue charges are time-barred, a question on which we have already found further proceedings to be necessary. If the answer is yes, then Perdue's $100,000 investment must be deducted from the aggregate. In addition, we have alluded to certain ambiguities in the record that also affect a determination of aggregate losses. One of these is the amount of *new investment* in the fraudulent venture, as distinct from involuntary rollovers of funds already transferred to defendant. In our view, only the former qualify as a "taking" for purposes of the statute. A third uncertainty concerns investors who made multiple payments into the venture. If each of these is a separate offense, then the court must determine which of them underlie defendant's convictions, and include only those sums in the aggregate.

46

By way of illustration only, and subject to the many numerical uncertainties in the evidence, our review of the record suggests that the victims named in the information invested an aggregate sum of $938,091 in the mobile home venture. From this figure must first be subtracted the $175,000 investment by the Lewises, who were the victims named in counts 7 and 17, on which the court acquitted defendant. This leaves $763,091 invested by the victims named in counts on which defendant was convicted. If prosecution on the Perdue counts is not found to be timely, then his entire $100,000 investment must be subtracted from the aggregate, leaving $663,000. If those counts are timely, then Perdue joins two other victims—Kloepfer and Repetti—as having made more than one transfer of new funds to the venture. As to each such investor, the court must decide whether each transfer constituted a separate offense or whether each series of investments constituted a single continuous offense. The Supreme Court's latest pronouncement on the subject seems to strongly favor a conclusion that these multiple payments constitute a single offense. (*People v. Whitmer*, *supra*, 59 Cal.4th 733, 742.) However, because defendant has not had an opportunity to address the question, and because the matter must be remanded in any event, it will be open to defendant on remand to argue that the each payment constituted a separate offense. Should the trial court be persuaded on that point, it will have to decide which offense underlies the conviction, and include only that payment in the aggregate for purposes of the enhancement.[22] On the other hand, if the court properly concludes that a series of payments by a given investor constituted a single continuous offense, it may include all such payments in the aggregate losses for purposes of the enhancement.

---

[22] In the case of Repetti, a finding that the investments were separate offenses will raise the further question whether prosecution was timely as to the initial $100,000 investment. If not, the corresponding conviction cannot be predicated on that payment.

Accordingly our remand will include instructions to determine not only the timeliness of the Perdue charges but also which investments by Repetti could sustain timely prosecution so as to be includible in the aggregate lost or taken for purposes of section 186.11(2)(a).  The court must also determine whether, in the case of other victims who made more than one investment, each investment constitutes a separate crime, and—if so—which crime underlies the conviction, and the amount of loss associated with it.

## IV.  *Multiple Punishment*

Counts 11 and 12, respectively, charged defendant with sale of an unregistered security (Corp. Code, §§ 25110, 25540, subd. (a)) and sale of a security by wilful scheme to defraud (Corp. Code, § 25541).  The trial court found defendant guilty of these charges and imposed a two-year sentence on each count, "concurrent to the sentences in Counts 13 through 22."[23]  Defendant contends that this constituted multiple punishment in violation of Penal Code section 654, subdivision (a) (section 654(a)), in that counts 11 and 12 rest on the same conduct underlying the other Corporations Code violations.

At a high enough level of abstraction it is certainly true that all of these counts depended on the same conduct:  the sale of interests in the mobile home venture.  Count 11 charged defendant with violating Corporations Code sections 25110 and 25540, subdivision (a), in that he "did willfully and unlawfully *sell and offer to sell* in this state an unqualified security subject to the provisions of Corporations Code sections 25111-25113."  (Italics added.)  Count 12 charged him with violating Corporations Code section 25541, in that he "did willfully and unlawfully engage, directly or indirectly, in an act, practice, or course of business which operated or would operate as a fraud or deceit upon said person(s) in connection with the *offer, purchase, or sale of a security*."  (Italics

---

[23]  Given that the court had acquitted defendant of count 17—a fact we find critical to our analysis—we interpret the last four quoted words as shorthand for "counts 13 through 16 and 18 through 22."

48

added.) Counts 13 through 22 charged him with violating Corporations Code sections 25401 and 25540, subdivision (b), in that, with respect to each named victim, he "did willfully and unlawfully *offer securities for sale and sell securities . . .* by means of written or oral communication which included an untrue statement of material fact or omitted to state a material fact necessary to make the statements made not misleading in light of the circumstances under which they were made." (Italics added.)

At a similarly elevated level of abstraction, punishing defendant separately for counts 11 and 12 might indeed seem to offend section 654(a), which as pertinent here provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." It would seem that imposing a sentence for selling an unregistered security to a particular person, and for using a fraudulent device in connection with the sale of a security to that person, would "punish" the defendant for the same "act or omission" as a sentence based upon his selling securities by means of untrue statements and omissions *to that person.*[24]

It is not necessary to address the question in the abstract, however, for on examination the record supports the trial court's action on the unassailable ground that it rests on concrete conduct distinct from that for which he was otherwise convicted.

A trial court's determination that two offenses are separately punishable is viewed on appeal in a light most favorable to the judgment, with the reviewing court inferring in

---

[24] The only case we have found involving a closely related question is *People v. Skelton* (1980) 109 Cal.App.3d 691, 725-726 (tacitly disapproved on another point in *People v. Figueroa* (1986) 41 Cal.3d 714, 731-733). The trial court there imposed concurrent sentences on counts alleging Corporations Code violations comparable to those at issue here. The defendant argued that these should have been stayed under section 654. But the state conceded the point, so the issue was not actually litigated.

49

support of the ruling "the existence of every fact the trier of fact could reasonably deduce from the evidence." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 271.) The question is thus not whether crimes appear to rest on the same act or omission in the abstract but whether the trial court could properly find facts that would justify its decision to impose separate punishments.

Defendant's argument assumes that counts 11 and 12 rest on the same sales of securities as those underlying counts 13 through 16 and 18 through 20. We must presume otherwise in support of the judgment. The court could instead find defendant guilty on counts 11 and 12 based on the distinct sales to Lowell and Kathleen Lewis, the victims named in counts 7 and 17, of which the court acquitted defendant. The court apparently found the evidence insufficient to sustain these two counts because there was no witness to any affirmative misrepresentations or material omissions specifically made by defendant to the Lewises. Given that lack, the prosecution was forced to rely on the absence of any record of written disclosures to them. The trial court understandably found that evidence insufficient to establish false pretenses, misrepresentations, or material omissions specifically directed to them, not to mention the requisite causal link between such conduct and their investments.

There was, however, ample evidence that the Lewises purchased interests in the mobile home venture. They wrote two checks totaling $175,000 to the "Ken Doolittle Mobile Home Trust." Lewis's son-in-law, Ronald Moore, testified that defendant admitted receiving these investments, which he said were for "a mobile home purchase, refurbish and resell business that he was in." Department of Corporations Examiner Kenneth Wu also testified that the Lewis investments were among those reflected in a log, furnished by defendant, showing deposits into the Mobile Home Trust Account.

Defendant himself admitted that the Lewises had invested in the mobile home venture, but asserted that their investment "was not assigned into any mobile home note."

50

The agreement with Mr. Lewis, he testified, was that "he would place his funds into my account and that I would use those funds to buy bank repossessed manufactured homes and that I would pay him an interest rate for that different from other investors. I did not make an agreement to assign him into specific notes. But pay him interest on the funds." Defendant testified that he promised to pay the Lewises either 13 or 15 percent, and to refund the principal investment upon 60 days notice. Pursuant to the agreement, he said, he paid interest to Lewis for about a year and a half, at which time they supposedly agreed "that we would accrue the interest rather than pay the interest monthly." Interest accruing thereafter, together with the original principle, remained unpaid.

The trial court found this evidence insufficient to sustain a conviction for elder theft (count 7) or the making of false statements or omissions in the sale of a security (count 17). It does not follow that the court found the evidence insufficient to sustain the allegation in count 11 that in securing the Lewis investments defendant "willfully and unlawfully s[sold] and offer[ed] to sell . . . an unqualified security," or the allegation in count 12 that he "willfully and unlawfully engage[d] . . . in an act, practice, or course of business which operated or would operate as a fraud or deceit . . . in connection with the offer, purchase, or sale of a security" to them. In contrast to counts 7 and 17, counts 11 and 12 required no finding that defendant had made any particular statements, or failed to disclose any risks to Mr. or Mrs. Lewis. Count 11 turned entirely on the question whether defendant sold a "security" to them; if he did, there is no doubt that it was unregistered. Count 12 turned largely on the same question, though it also required a finding that the sale was connected with a "practice, or course of business" tending to operate as a fraud or deceit upon purchasers.[25]

---

[25] That the court recognized the difference is suggested by its remarks when defense counsel moved to strike the testimony of the Lewises' son-in-law. Counsel argued in essence that the testimony was irrelevant because it merely established the fact of the Lewis investment, which was immaterial unless the investment had been induced

The trial court could find, and impliedly did find, that defendant sold a "security" to Mr. Lewis. It is true that defendant claimed his agreement with Lewis did not contemplate transferring any of the underlying indebtednesses to them. This testimony, if credited, might support a finding that the transaction was a simple loan. (See *People v. Davenport* (1939) 13 Cal.2d 681, 690 [transaction not a security where all defendant promised was to pay interest and principal on specified terms; "the expectation of the mere payment of *interest* does not transform the transaction into an 'investment' contract within the meaning of the act"]; *People v. Coster* (1984) 151 Cal.App.3d 1188, 1194-1195 [distinguishing *Davenport*, and finding a security, where defendant promised share in profits as well as interest].) However, where funds are publicly solicited, the fact that the transactions take the form of loans will not prevent their treatment as regulated securities. (See *People v. Schock* (1984) 152 Cal.App.3d 379, 386 ["a public offering of *unsecured* promissory notes repayable with interest falls within the statutory purpose"]; *People v. Walberg* (1968) 263 Cal.App.2d 286, 294 [promissory notes were securities where officer of nonprofit religious corporation solicited funds at large for refurbishing a hotel to be used for missionary purposes]; *People v. Leach* (1930) 106 Cal.App. 442, appeal dismissed at 283 U.S. 808 [undersecured mortgage notes sold to public to finance subdivision development were securities]; *In re Leach* (1932) 215 Cal. 536, 545-546, appeal dismissed 287 U.S. 579 [reaching same conclusion in same case on habeas corpus].) Here, although the prosecution expert did not speak in terms of a "public offering," he did repeatedly allude to defendant's seeking investors through a "general solicitation," a fact that defeated any defense defendant might otherwise have under the statutory exemption for private placements. (See Corp. Code, § 25102, subd. (f).)

---

by misrepresentations. The court accepted the premise of the objection arguendo, but noted the presence of charges other than fraud, and denied the motion.

In any event the trial court was not obliged to credit, and presumptively did not credit, defendant's characterization of the Lewis investment. After trial the court expressed grave doubts about defendant's overall credibility.[26] His testimony concerning the nature of the Lewis investment could justify particular suspicion precisely because it came after the prosecution's expert had predicated much of his testimony on the fact that defendant was selling interests, often fractionalized, in debt instruments. The expert, retired Corporations Department Enforcement Director George McDonald, answered affirmatively the question whether "the offerings of Recycled Housing Manufactured Home promissory note program and the related programs" were "securities under California law." In explaining this opinion, he testified that defendant was selling "products" that he "called promissory notes." He testified that there was "no doubt under the case law that promissory notes are securities," at least when "the investor is dependent on the skill, solvency, success and services of the issuer." The question is whether the investor "is . . . passive and looking to this promoter to make the investment profitable." An affirmative answer also indicates that the transaction involves an "investment contract"—a security by statutory definition (see Corp. Code, § 25019)—which means "the investment of money in a common enterprise with the expectation of profit primarily from the efforts of the promoter or a third party." "[I]t's a security, it's an investment contract if the investors were passive and are looking to the promoter to take the important entrepreneurial steps to make the offering successful. And in this case

---

[26] At sentencing the court remarked, "Mr. Doolittle, you're one of the smartest people I've ever met. You're extremely deferential. You're extremely polite. You've had a stellar record. You're a Great American. But, you know, you can't wrap yourself around in a flag as you have and expect people to not see through it. And for whatever reason it was every time you open your mouth, every time you say something, I don't believe a word of it. I didn't believe it two years ago. I didn't believe it yesterday. I don't believe it today."

53

the investors had no control over their own destiny in terms of these investments. They were completely dependent upon Mr. Doolittle."

Despite the potential application of some of this testimony to the Lewis investment as described by defendant, much of Mr. McDonald's testimony assumed an investment fitting the more typical pattern described by most of defendant's victims, i.e., the purchase of an interest in the debts of mobile home purchaser-borrowers. Defendant's attempt to describe the Lewis investment in a way taking it outside this paradigm could be viewed by the court as entirely strategic and unworthy of belief. The only other investor as to whom defendant made such a claim was Perdue, as to whom the prosecution case was burdened by difficulties resembling, though not as acute as, those concerning the Lewis investment. Just as the court impliedly rejected defendant's characterization of the Perdue investment, it could have rejected his depiction of the Lewis investment as a fabrication tailored to avoid the effect of the expert testimony.

Once the court found that defendant sold a security to the Lewises—but that the prosecution had failed to prove the making of any accompanying false statements or omissions—the court was free to find that the Lewis investment constituted the sale of an unregistered security, as alleged in count 11, for which defendant was not otherwise being punished. This leaves only the question whether the evidence would sustain a finding, for purposes of count 12, that in taking the Lewis's money defendant "willfully and unlawfully engage[d] . . . in an act, practice, or course of business which operated or would operate as a fraud or deceit . . . in connection with the offer, purchase, or sale of a security." The court could find, and presumptively did find, that the entire mobile home venture constituted a "course of business" that "would operate as a fraud or deceit" in connection with any investment defendant might solicit or accept. It would follow that by obtaining the Lewis investment, defendant engaged in an act or practice operating as a fraud or deceit in connection with the sale of a security to them.

54

We conclude that the trial court did not err in failing to stay punishment on counts 11 and 12.

### V. *Error in Abstract of Judgment*

Defendant asserts that the abstract of judgment fails to accurately reflect the sentence imposed, in that one entry states he was sentenced to 15 years on certain counts, when in fact—and as stated correctly elsewhere in the abstract—the sentence was 13 years. Respondent concedes the clerical error. Our disposition may render this error moot by requiring that a new abstract ultimately be prepared. In any event, the trial court should ensure that the abstract reflects the sentence actually imposed.

### DISPOSITION

The conviction on counts 8 and 18 is reversed with directions to conduct a new hearing on the timeliness of the charges with respect to Joseph Perdue. If the prosecution carries its burden of establishing accrual within the limitations period, the court shall reinstate the judgment in its present form, correcting the clerical error identified on appeal. If the prosecution fails to establish the timeliness of those charges, the court shall revisit the sentence enhancement for aggregate losses, determining which investments underlie the convictions and imposing only such enhancement as is supported by the aggregate sum of such investments. In all other respects the judgment is affirmed.

_____
RUSHING, P. J.

WE CONCUR:


_____
PREMO, J.


_____
ELIA, J.


*People v. Doolittle*
**H037391**

56

Trial Court:                                            Santa Cruz County
                                                        Superior Court No.:  F17146


Trial Judge:                                            The Honorable Paul M. Marigonda


Attorney for Defendant and Appellant                   J. Wilder Lee
Kenneth Mark Doolittle:                                under appointment by the Court
                                                       of Appeal for Appellant


Attorneys for Plaintiff and Respondent                 Kamala D. Harris
The People:                                            Attorney General

                                                       Dane R. Gillette,
                                                       Chief Assistant Attorney General

                                                       Gerald A. Engler,
                                                       Senior Assistant Attorney General

                                                       Rene A. Chacon,
                                                       Supervising Deputy Attorney General

                                                       Linda M. Murphy,
                                                       Deputy Attorney General


*People v. Doolittle*
**H037391**